CHANDLER, J.,
for the Court.
¶ 1. The Circuit Court of the First Judicial District of Hinds County reversed the decision of the Board of Trustees of the Public Employees’ Retirement System (PERS) denying disability benefits to Ruby Finklea. PERS appeals. We find no error and, therefore, affirm the decision of the circuit court.
FACTS
¶ 2. Ruby Finklea has 6.5 years of creditable service as a school custodian. The Pascagoula School District terminated Finklea on March 5, 1999, the date that Finklea was hospitalized due to a heart attack. At the time of her termination, Finklea was the leader of her school’s custodial crew, a position she had held for approximately two years. As crew leader, Finklea was the senior custodian in charge of keeping the school and grounds clean.
¶ 3. On March 5, Finklea presented to Singing River Hospital with acute myocardial infarction. Physicians determined that Finklea urgently needed coronary artery bypass surgery, and performed a cardiac catheterization and a right coronary artery angioplasty in order to stabilize Finklea in preparation for the surgery. Finklea was transferred to Mobile Infirmary where Dr. Terry C. Stelly performed quadruple coronary artery bypass surgery. Post-operatively, Finklea exhibited poor left ventricular function. Finklea had several follow-up appointments with Dr. Stelly and then began seeing a cardiologist, Dr. Jaswinder Kandola. Finklea also received treatment from Dr. Robert Donald for diabetes mellitus, a condition she was diagnosed with in 1992.
¶ 4. Finklea applied for and was approved for Social Security disability benefits. Finklea filed an application for disability retirement with PERS on September 1, 1999. On February 3, 2000, the PERS Medical Board requested medical records from Dr. Kandola in order to obtain the results of a June 1999 echocardiogram. On February 24, 2000, the Medical Board denied Finklea’s claim. Finklea appealed, and a hearing was held before the PERS Disability Appeals Committee. The Committee found that the record contained no objective medical evidence to support Finklea’s claim that she is unable to perform her job. The Committee recommended that the PERS Board of Trustees affirm the denial of Finklea’s claim. On August 22, 2000, the Board of Trustees approved and adopted the recommendation of the Committee that Finklea’s claim be denied. The Circuit Court of the First Judicial District of Hinds County reversed the decision of the Board, finding that it was not supported by substantial evidence and was arbitrary and capricious. PERS has appealed.
LAW AND ANALYSIS
¶ 5. PERS is a state entity which provides disability and retirement income *571 to state employees. Miss.Code Ann. § 25-11-3 (Rev.1999). Mississippi Code Annotated section 25-ll-113(l)(a) (Rev.2003) contains the criteria for disability retirement:
Upon the application of a member or his employer, any active member in state service who has at least four (4) years of membership service credit may be retired by the board of trustees .provided that the medical board, after an evaluation of medical evidence that may or may not include an actual physical examination by the medical board, shall certify that the member is mentally or physically incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that the member should be retired....
In making its disability determination, the Medical Board must apply the following statutory definition of disability:
the inability to perform the usual duties of employment or the incapacity to perform such lesser duties, if any, as the employer, in its discretion, may assign without material reduction in compensation, or the incapacity to perform the duties of any employment covered by [PERS] that is actually offered and is within the same general territorial work area, without material reduction in compensation.
Id. In lieu of a certification from the Medical Board, the PERS Board of Trustees “may accept a disability medical determination from the Social Security Administration.” Id. The applicant for disability retirement has the burden of proving that he or she is actually disabled. Pub. Employees’ Ret. Sys. v. Dishmon, 797 So.2d 888, 893 (¶ 15) (Miss.2001).
¶ 6. This Court adheres to a limited standard of review of PERS decisions. Pub. Employees’ Ret. Sys. v. Ross, 829 So.2d 1238, 1240 (¶ 11) (Miss.2002). We may only review the record before PERS to determine whether its decision was (1) supported by substantial evidence; (2) arbitrary and capricious; (3) beyond the power of the Board to make, or (4) violated the applicant’s statutory or constitutional rights. Id. In our review of the record, this Court may not substitute its judgment for that of PERS and may not reweigh the evidence. Id. Further, there is a rebutta-ble presumption in favor of the PERS decision. This standard of review is identical to that employed by the circuit court. Dishmon, 797 So.2d at 890(¶ 9).
¶ 7. On appeal, PERS argues that: (1) the circuit court erred in reweighing the facts and substituting its judgment for that of the administrative agency in finding that Finklea is entitled to the receipt of disability benefits, and (2) the circuit court erred in determining that Finklea presented substantial evidence of disability and that the decision of PERS is arbitrary and capricious. These arguments attack the circuit court’s adherence to the proper standard of review of a PERS decision and will be addressed together. Finklea argues that she presented substantial evidence to PERS that she was disabled and, therefore, the circuit court correctly held that the PERS decision was arbitrary and capricious.
¶ 8. “Substantial evidence” has been defined as “such relevant evidence as reasonable minds might accept as adequate to support a conclusion.” Pub. Employees’ Ret. Sys. v. Marquez, 774 So.2d 421, 425 (¶ 13) (Miss.2000). “Substantial evidence has been defined as that which provides an adequate basis of fact from which the fact in issue can be reasonably inferred.” Dishmon, 797 So.2d at 892 (¶ 13). “If an administrative agency’s decision is not based on substantial evidence, it necessarily follows that the decision is arbitrary and capricious.” Marquez, 774 *572 So.2d at 430 (¶ 35). “An administrative agency’s decision is arbitrary if not done according to reason or judgment, but dependent on the will alone. An action is capricious if done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settled controlling principles.” Miss. State Dept. of Health v. Natchez, 743 So.2d 973, 977 (¶ 13) (Miss. 1999). A PERS decision may be found arbitrary and capricious if PERS fails to make adequate findings and explain how it evaluated and balanced certain interests such that a reviewing court is able to understand why it rendered the decision. Ross, 829 So.2d at 1243 (¶ 26).
¶ 9. The Pascagoula School District submitted PERS Form 6B with an attached description of Finklea’s duties as custodial crew leader. Among other duties, the job required sweeping, mopping, scrubbing and waxing all floors, washing walls, windows and woodwork, cleaning and disinfecting restrooms, arranging and moving furniture and equipment, assisting in setting up assembly areas, cleaning chalkboards, keeping the school grounds free from rubbish, storing and disposing of trash, and supervising the other custodial personnel. The job required that Finklea frequently lift objects weighing between ten and thirty pounds, occasionally lift objects between thirty and forty pounds, and rarely lift objects between forty and one hundred pounds. The job involved frequent squatting, standing, climbing, and bending, with occasional sitting. The job included frequent simple grasping, pushing and pulling, and fine manipulation. Job activities frequently involved unprotected heights, being around moving machinery, and exposure to chemicals and temperature changes. The school district required that the custodial crew leader be “physically sound” and capable of passing a complete physical examination in order to continue in the job.
¶ 10. The school district stated that Finklea’s duties were impaired by her disability because she could not bend or lift without experiencing chest pains and could not stay on her feet for a long period of time. The school district stated that Fink-lea appeared to be motivated toward realizing further employment, but that it did not have any lighter duty employment available for Finklea. The school district did not offer her any other job. No other job covered by PERS was offered to Fink-lea. Therefore, the question before the Board was whether Finklea presented substantial evidence that she was unable to perform the usual duties of her employment as custodial crew leader, that she was likely permanently mentally or physically incapacitated from further performance of duty, and that she should be retired. Miss.Code Ann. § 25-ll-113(l)(a) (Rev.2003).
¶ 11. Finklea was fifty-one years old at the time of her March 1999 myocardial infarction and quadruple bypass surgery. Finklea had several follow-up visits with Dr. Stelly, and began seeing Dr. Kandola on June 24, 1999. An echocardiogram ordered by Dr. Kandola and performed on June 29, 1999, revealed that Finklea had a slightly enlarged left ventricle and an ejection fraction of 40%. On July 2, 1999, Dr. Stelly stated in a letter to PERS that Finklea “had a very difficult recuperation because of poor left ventricular function.” He further stated that, as of that date, he considered Finklea “totally disabled from returning to vigorous activity, although light duty might be a possibility.”
¶ 12. In another letter, dated August 31, 1999, Dr. Stelly described Finklea’s progress to date. He stated that she had continuing problems with chest soreness and malaise and was treated with Ibupro *573 fen and Darvoeet. Dr. Stelly stated that, in his estimation, Finklea was disabled as a result of a large myocardial infarction and resulting poor left ventricular function, but that he was unable to “know for sure” unless a repeat echocardiogram was performed to provide objective evidence of left ventricular systolic function. He stated that because Dr. Kandola was “more in a position to obtain this information,” he would defer any final recommendation regarding Finklea’s disability to Dr. Kando-la.
¶ 13. Dr. Kandola’s notes reveal that he saw Finklea three times. On June 24, 1999, Dr. Kandola stated that Finklea was having problems with “cough with severe chest pain” and was feeling depressed at times. He stated that she was afraid to go out and do anything for herself and was not attending cardiac rehabilitation. He stated that she had not recovered well from her bypass surgery, and opined that her “problem” was psychological and emotional rather than physical. Dr. Kandola stated that he assured Finklea that the “possibility of pain and depression is very common” after surgery. He stated that Finklea seemed “very reluctant” and “happy and contended with her disability attitude.”
¶ 14. On July 27, 1999, Dr. Kandola stated that Finklea was still experiencing chest pains, that the pains were not worse with exercise, and that Finklea felt that exercise was beneficial. He stated that these pains were musculoskeletal, not coronary, and that he advised her to take pain medication and try to ignore them. He noted that she had begun cardiac rehabilitation.
¶ 15. On January 27, 2000, Dr. Kandola stated that Finklea was attending cardiac rehabilitation, and that she denied any chest tightness or shortness of breath. Finklea stated she felt weak and fatigued all the time. Finklea also-stated that she was unable to work and that her work was lifting heavy things. Dr. Kandola stated that he explained to Finklea that she had done very well “as far as cardiac things are concerned” and that she “should car-ryon [sic] her daily activities.” He then stated:
Patient has repeatedly states [sic] that she is unable to carryon [sic] her daily duties at work. I certainly have sympathy with her. I think she may change her job to something lighter if she is unable to do it. At this point I do not see any contra-indication from cardiac point of view to do any kind of reasonable job for this lady’s age and sex.
¶ 16. On April 4, 2000, cardiologist Dr. David Shaw examined Finklea. Dr. Shaw stated that Finklea was negative for chest pain and shortness of breath. Dr. Shaw ordered an echocardiogram to reassess left ventricular function. The echocardiogram was performed on May 3, 2000, and concluded that Finklea had “upper normal left ventricular size with mild to moderate an-teroseptal hypokinesis” and “mild global dysfunction with ejection fraction of 0.40.” In a letter to Finklea’s attorney on May 19, 2000, Dr. Stelly noted that Finklea’s job required that she pass a physical examination, and opined that Finklea would not be able to complete a “physical examination without having to be physically sound.” He then stated that Finklea “does indeed, have decreased cardiac function following her heart attack and subsequent heart surgery and is not expected to improve more than where she is at this point in time.”
¶ 17. At the hearing on July 14, 2000, Finklea testified that she was able to do light housework at home, such as cooking and washing, but was limited by chest pain, which she described as “heaviness.” She stated that she still experienced *574 numbness in her chest and leg, at the location where veins were surgically removed for the arterial graft. She testified that foot pain and numbness caused by diabetes had gotten worse since her surgery, and that she had to elevate her feet in order to prevent swelling and pain. She stated that her ongoing cardiac rehabilitation consisted of exercises such as walking on a treadmill or riding a bicycle while wearing a heart monitor. She stated that recently she had been placed on medication for a problem with rapid heart beat.
¶ 18. Finklea testified that she thought she could perform the lighter tasks required by her job as head custodian, but that she could no longer do tasks such as picking up heavy things, rearranging furniture, carrying desks across the school yard, dumping large trash cans, operating the floor buffing machine, walking constantly, and working outside in the summer heat. She stated that she would be able to clean the bathrooms and scrub floors and walls, but would have to be allowed to stop when limited by chest pain and shortness of breath. Finklea testified that, at the time of her heart attack, she and another female were the only custodians at the school. She stated that she had enjoyed her job and would return to work if she could.
¶ 19. Finklea’s daughter, Kimberly Finklea, stated that she sees her mother almost every weekend. She stated that her mother performed light household tasks such as placing clothes in the washing machine, cooking, mopping, wiping and sweeping, but that Kim and her siblings had to perform any work involving heavy lifting, such as taking the garbage out, opening windows, throwing the mop water away, moving furniture and lifting baskets of clothes.
¶ 20. In its recommendation that was adopted by the Board of Trustees, the Disability Appeals Committee cited Dr. Kandola’s statement that Finklea felt she benefitted from exercise but that she still experienced pain, weakness and fatigue. The Committee cited Dr. Kandola’s opinion that, from a medical standpoint, there was no reason that Finklea could not carry on her daily activities. The Committee stated that the June 1999 echocardiogram showed an ejection fraction of 40%, and that the May 2000 echocardiogram indicated that there had been no change. The Committee then stated that it found “no objective medical evidence which supports Mrs. Finklea’s claim that she is unable to perform her duties as a Custodian. Mrs. Finklea has not attempted to return to work since her surgery and her treating cardiologist, Dr. Kandola, finds no contraindications from a cardiac point of view to Mrs. Finklea returning to work. The medical records do not support Ruby Finklea’s claim that she is permanently disabled.” The rest of the Committee’s recommendation recited facts, procedural history, and the applicable law.
¶ 21. The circuit court found that Fink-lea had presented substantial evidence that her medical condition precluded her from performing the usual duties of her employment and that the Board’s finding that she was not disabled was arbitrary and capricious. We agree. The Committee’s recommendation stated that there was no objective medical evidence that Finklea is disabled. We observe that information contained within medical records is considered objective, not subjective, evidence of disability. Marquez, 774, So.2d at 427 (¶22). In contrast to the Committee’s finding, Finklea did present objective evidence that her heart condition was disabling. Finklea’s June 1999 echocardiogram indicated an ejection fraction of 40%. Finklea’s heart surgeon, Dr. Stelly, opined that, as of July 2, 1999, Finklea was totally *575 disabled from vigorous activity because of poor left ventricular function. On August 31,1999, Dr. Stelly again opined that Fink-lea’s heart condition rendered her disabled, but conditioned the accuracy of his opinion on whether or not a repeat echo-cardiogram indicated improvement. Fink-lea’s May 2000 echocardiogram showed an ejection fraction of 40%, and the Committee recognized that this indicated “no change.” Dr. Stelly’s letter of May 2000 stated that Finklea had decreased cardiac function and was not expected to improve further.
¶ 22. The Committee’s recommendation did not refer to Dr. Stelly’s opinions, and relied solely upon the medical records of Dr. Kandola. The Committee found that Dr. Kandola had opined that Finklea “could return to work.” This finding is unsupported by the record. Dr. Kandola never stated that Finklea could return to her job as custodial crew leader, rather, he stated that she “could perform any reasonable job for [her] age and sex.” Dr. Kan-dola did not define what constituted a “reasonable job” for someone of Finklea’s age and sex, nor did he state whether a “reasonable job” would include the vigorous activity required of Finklea as a lead custodian. Dr. Kandola did state that if Finklea was unable to perform her former job, she might do something lighter. From this statement it may be reasonably inferred that Dr. Kandola thought Fink-lea’s ability to perform her job might be limited by her condition, depending upon how Finklea assessed the situation. Therefore, Dr. Kandola’s statement does not support the proposition that Dr. Kan-dola unconditionally believed that Finklea could return to work as a custodial crew leader. Further, Dr. Kandola’s statement that Finklea could carry on her daily activities is not substantial support for the conclusion that he thought she could return to her former job. This is because, at the time of her visit to Dr. Kandola, Finklea had not worked for approximately ten months, and her “daily activities” did not include the litany of heavy tasks that she had performed at her job.
¶ 23. The record was uncontradicted that Finklea had decreased cardiac function after her quadruple bypass surgery, and that her condition was not expected to improve. The Committee did not reasonably explain why it found that Finklea’s condition did not preclude her performance of the tasks required by the lead custodian position. Neither did the Committee explain why it rejected the objective medical evidence provided by Dr. Stelly. Instead, the Committee relied upon statements by Dr. Kandola that provided insubstantial support for the conclusion that Finklea could return to her former job. While PERS may choose between contradictory medical evidence and may reject evidence it finds deficient, PERS may not, without explanation, deny disability benefits when faced with apparently substantial, objective evidence of disability. As Finklea presented substantial evidence that she could no longer perform the usual duties of her employment due to permanent decreased cardiac function, we find that the decision of PERS was arbitrary and capricious. Therefore, we affirm the decision of the circuit court.
¶ 24. THE JUDGMENT OF THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P JJ., BRIDGES, THOMAS, LEE, IRVING, MYERS AND GRIFFIS, JJ., CONCUR.