LAMAR, Justice,
Dissenting.
¶41. I respectfully dissent from the majority’s opinion, as it appears to me there is substantial evidence to support PERS’ decision and, in my opinion, the circuit court improperly reweighed the evidence. As an administrative agency, PERS sits as the finder of fact, not the reviewing court. Pub. Employees’ Ret. Sys. v. Cobb, 839 So.2d 605, 609 (Miss.Ct.App.2003). Neither the circuit court nor this Court can reweigh the evidence, as it appears to have done at present.
¶ 42. The majority cites PERS’ failure to contest the evidence provided by Dish-mon’s doctor or to submit Dishmon to an independent examination, but the Legislature has imposed no requirement upon PERS to do either. Rather, PERS, as the finder of fact, has the discretion to objectively review the evidence and determine the weight to be given to statements of personal physicians. Pub. Employees’ Ret. Sys. v. Stamps, 898 So.2d 664, 674 (Miss.2005) (citing Pub. Employees’ Ret. Sys. v. Dearman, 846 So.2d 1014 (Miss.2003)). Contrary to the majority’s finding, PERS did not ignore the evidence presented in this case but thoroughly discussed each disability listed, often citing years’ worth of tests and readings within Dr. Pierce’s report that reasonably supported its findings.
¶ 43. For clarity, I offer the following factual history. Dishmon took leave without pay due to alleged disability on July 5, 1996.[2] Dishmon filed her initial claim with *96 PERS for disability retirement benefits in 1997. Initially, Dishmon claimed chronic osteomyelitis, insulin-dependent diabetes mellitus, and hypertensive cardiovascular disease, with poor prognoses on all three, as preventing her from performing her job. She stated that her frequent activities on the job included sitting, writing, and repetitive fine manipulation of her hands. She occasionally walked and used her hands for simple grasping, pushing, and pulling.
¶ 44. Dishmon’s second hearing before PERS began on August 13, 2001. At that hearing, she alleged the same complaints as presented at the 1997 hearing, in addition to: carpal tunnel syndrome, degenerative back disease, thyroid nodules, neuro-pathy, trouble concentrating, and pain in her upper and lower extremities. Dish-mon also testified that she had begun treatment for depression in 1997.
¶ 45. The Disability Appeals Committee, which consisted of two internists and a nurse, reviewed Dishmon’s claims in depth. It started by analyzing Dishmon’s allegations in her original filing. The Committee noted that the medication list, the hospitalization list and records, and Dr. Pierce’s office records all were dated after 1996. Dishmon stated that these were all she could produce, as her records were voluminous and would have been too expensive to copy in full.
¶ 46. The Committee noted that the degenerative disk disease Dishmon referred to was diagnosed in 1998, after she already had left work. The Committee also found that osteomyelitis was not referenced in any of her medical records. Dishmon testified that she began intravenous treatment for the osteomyelitis with Vancomycin around June of 1997, though it was not diagnosed until 1998. The Committee noted that, even if Dishmon had suffered from osteomyelitis in 1996, it was successfully treated with antibiotics and therefore no longer contributed to her inability to perform her job, which consisted mostly of sitting. The Committee also noted that nothing in her records up to the date she left work mentioned neuropathy; nor was there any mention of anxiety, depression, or atherosclerotic vascular disease in her doctor’s records from 1996.
¶47. Additionally, regarding the diagnosis of chronic obstructive pulmonary disease (COPD), the Committee noted that no pulmonary specialists were consulted, no pulmonary function studies were performed, and there was no listing of medications for pulmonary problems. Her complaints of lower-back pain began in 1997 or 1998, and x-rays showed mild degenerative disk disease of the lower back in 2000. Furthermore, the record shows that Dishmon’s gastrointestinal problems did not arise until after the date of termination.
¶ 48. The Committee thoroughly reviewed levels of blood glucose taken at least twelve times between June 1996 and December 1997, all of which were below what the medical community finds serious, much less disabling. The Committee did a similar analysis regarding blood pressure readings over the years and found Dish-mon’s blood pressure to be well-controlled. The Committee noted that cardiac tests from July of 1995 came back normal, and a cardiologist took Dishmon off some of her numerous medications in 2001, with no apparent problems. The Committee noted hypothyroidism is not uncommon and should not be disabling as long as medication is taken. Since Dishmon did not see a psychiatrist or counselor regarding her depression, the Committee concluded *97 it was probably not severe, let alone disabling.
¶ 49. Lastly, the Committee discussed what it believed to be the most important allegation, which was carpal tunnel syndrome. The Committee noted that there were no tests confirming carpal tunnel syndrome until 1999, nor was it mentioned in her medical records from 1996. They also noted that the orthopedist had placed no restrictions on Dishmon. The Committee ultimately concluded the carpal tunnel syndrome was not disabling, because Dish-mon’s complaints regarding carpal tunnel wei’e sporadic rather than consistent, and she had waited four years to have surgery, while most people with disabling carpal tunnel have the surgery immediately.
¶ 50. In its “Conclusions of Law,” the Committee looked at Dishmon’s numerous complaints as a whole. It highlighted many of the above findings as well as Dr. Pierce’s entry that “he thought nothing was wrong with Ms. Dishmon, yet she insisted on testing.” The Committee concluded that Dishmon was not statutorily disabled.
¶ 51. On appeal, the trial court noted evidence that some of the illnesses can be controlled with medication and that some of the illnesses were nonexistent when Dishmon took leave without pay. Yet the court still concluded that PERS ignored substantial evidence of disability, and that the decision was arbitrary and capricious, in large part, because PERS did not require Dishmon submit to an independent medical examination.
¶52. This Court should not impose a duty upon PERS to bring forth its own evidence. In Case v. Public Employees’ Retirement System, the appellant argued that PERS’ denial of her benefits was not supported by substantial evidence, because her disability was supported by the reports of her doctors, and PERS had failed to order a separate psychiatric evaluation. Case v. Pub. Employees’ Ret. Sys., 973 So.2d 301, 310-11 (Miss.Ct.App.2008). The Court rejected this argument, however, because the Committee, using its medical expertise, had thoroughly reviewed the medical records and sufficiently explained its conclusion. Id. at 313. Indeed, the Court noted: “ ‘[p]art of the benefit of having physicians on the Disability Appeals Committee is so that they can analyze the medical claims. When a thorough set of findings and conclusions explain the expertise that those physicians applied, we find no fault in relying on such expertise.’ ” Id. at 312-13 (quoting Flowers v. Pub. Employees’ Ret. Sys., 952 So.2d 972, 980 (Miss.Ct.App.2006)). Lastly, the Court noted that the applicable requirement is not an independent evaluation, but an explanation that goes beyond mere conclusions. Id.
¶ 53. In the case sub judice, the Disability Appeals Committee has thoroughly gone through each alleged disability, often citing years’ worth of tests, to explain its findings. In its “Conclusions of Law,” the Committee explicitly stated it had examined the cumulative effect of each condition affecting Dishmon; it referenced the objective medical records and tests provided by Dishmon; and it explained why Dish-mon’s conditions as a whole do not meet the statutory requirements of disability. Further, as noted by this Court in Dishmon I, “[t]his Court cannot attempt to weigh the credibility of Dishmon.... The Appeals Committee was the trier of facts in this case, and it had the opportunity to look the witnesses in the eyes to determine credibility.” Pub. Employees’ Ret. Sys. v. Dishmon, 797 So.2d 888, 893 (Miss.2001). Given all of the above, I fail to see how PERS' ignored substantial evidence in reaching its conclusion.
*98 ¶ 54. The majority references Public Employees’ Retirement System v. Dearman, 846 So.2d 1014 (Miss.2003), for the proposition that, by not conducting an independent evaluation, PERS ignored the only evidence in the record. The controlling statute, Section 25-11-113, makes it abundantly clear that PERS is under no obligation to conduct an independent medical evaluation. According to the statute, an employee who has at least four years of membership service credit (beginning pri- or to July 1, 2007) may receive disability retirement allowance:
provided that the medical board, after an evaluation of medical evidence that may or may not include an actual physical examination by the medical board, certifies that the member is mentally or physically incapacitated for the further performance of duty, that the incapacity is likely to be permanent, and that the member should be retired....
Miss.Code Ann. § 25-11-113(1)(a) (Rev.2006) (emphasis added).
¶ 55. I find Justice Cobb’s dissent in Dearman to be sound. Dearman, 846 So.2d at 1019-22 (Cobb, J., dissenting). In Dearman, as in this case, the Court effectively reweighed the evidence, substituting its opinion for that of PERS, and literally shifted the burden to PERS to present evidence. Id. at 1020-21. Justice Cobb eloquently spoke to the difficulties posed by these cases when she stated:
Cases like Dearman’s are hard ones to decide. A claimant professes to be in great pain so that she can no longer work. It is difficult to evaluate such claims: legitimately disabled persons are entitled to relief, but on the other hand, if PERS is required to credit every such claim before it, then it may as well close up shop and just write checks. Such hard cases and close calls are best made by the administrative agency with the professional skills, the daily experience, and the face-to-face opportunity to evaluate these close calls. That is why administrative agencies exist; why we regularly defer to their findings; and why the majority errs in deciding, on a cold record, that judicial opinions outweigh medical ones.
Id. at 1022.
¶ 56. For all the aforementioned reasons, I respectfully dissent.

. According to Section 25-11-113(1)(b), “[a]ny inactive member ... who has withdrawn from active state service, is not eligible for a disability retirement allowance unless the disability occurs within six (6) months of the termination of active service and unless satisfactory proof is presented to the board of trustees that the disability was the direct cause of withdrawal from state service." Miss. *96 Code Ann. § 25 — 11—113(1)(b) (Rev.2006) (emphasis added).